OFFICE OF THE ARCHITECT OF THE CAPITOL, Petitioner,

v.

OFFICE OF COMPLIANCE, Respondent,

and

Juanita Johnson, Respondent.

No. 03–6001.

United States Court of Appeals, Federal Circuit.

March 11, 2004.

Matthew M. Collette, Attorney, Washington, DC, argued for petitioner. With

him on the brief were Peter D. Keisler, Assistant Attorney General; and, Marleigh D. Dover, Attorney.

Peter A. Eveleth, General Counsel, Washington, DC, argued for respondent Office of Compliance. With him on the brief were Michael R. Lemov, Deputy General Counsel; and Chery l. Polydor, Attorney.

Sarah J. Starrett, Beins, Axelrod, Kraft, Gleason & Gibson, P.C., Washington, DC, argued for respondent Juanita Johnson. With her on the brief was Beth Slavet.

Before LOURIE, DYK, and PROST, Circuit Judges.

PROST, Circuit Judge.

The Office of the Architect of the Capitol ("AOC") petitions for review of the decision of the Board of Directors of the Office of Compliance ("Board") ordering AOC to permanently assign Juanita Johnson ("Johnson") to the position of subway operator as a reasonable accommodation pursuant to the Americans with Disabilities Act of 1990, 42 U.S.C. §§ 12101 et seq. ("the ADA"), and awarding Johnson back pay, damages, attorney fees, costs, and interest. *Johnson v. Office of the Architect of the Capitol,* No. 99–AC–326 (DA) (Office of Compliance Nov. 20, 2002). Because substantial evidence shows that a reasonable accommodation of Johnson was possible without causing any undue burden to AOC, we affirm.

## BACKGROUND

### I

The following facts are taken from the initial decision of the Hearing Officer assigned to Johnson's case. *See Johnson v. Office of the Architect of the Capitol,* No. 99–AC–326 (DA) (Office of Compliance Mar. 19, 2001) ("Initial Decision").

AOC has approximately 2000 employees who maintain the House and Senate office buildings. Johnson is one such employee, having worked as a night custodian for nineteen years. Johnson also has asthma, chronic obstructive pulmonary disease, and mild restrictive changes in her lungs that reduce her lung capacity.

In July of 1999, Johnson voluntarily transferred from her assignment at the House of Representatives Buildings to an assignment at the Hart Senate Office Building. Beginning in October of 1999, the Dirksen Senate Office Building underwent extensive renovations. One evening that month, Johnson began to wheeze and experience shortness of breath after passing through Dirksen on the way to her Hart Building assignment. She used her inhaler eight times that night without receiving significant relief and later informed her acting supervisor that she was having difficulty breathing.

The next day she went to her doctor, who recommended that she try to find a different work position. On October 15, 1999, the doctor wrote a letter, stating that "Mrs. Johnson has severe bronchial asthma which is aggravated by environmental aeroallergens, for example, dust and pollen. It is therefore advisable that the patient be transferred to a work environment where she is not exposed to excessive dust." Johnson gave a copy of this letter to her general supervisor, who responded that there were no non-custodial positions available for Johnson. Three days later, Johnson met with the deputy superintendent of the Senate Office Buildings to request assignment to a different position. He also responded that there were no positions available for Johnson. Johnson then requested that she be transferred back to her position at the House building where her symptoms had been manageable. The deputy superintendent declined

to do so. Thus, Johnson continued working in her custodial position at the Hart Building through October, November, and early December of 1999. At some point during that time, AOC offered her a mask to wear while working, but the mask did not help because Johnson felt as if it was suffocating her.

On December 10, 1999, new carpet was laid in the Hart Building and strong fumes from the carpet glue permeated the air, adversely affecting several workers, including Johnson. She began to experience shortness of breath, tightness in her chest, a burning throat, and a feeling that she was suffocating. She told her supervisors that she could not work under such conditions and she left to go to the emergency room. One or two days later, Johnson returned to work, but found that there were still strong fumes from the carpet installation. She requested assignment to a different building, but was told that if she could not perform her assigned work, she would not be paid. Johnson then attempted to perform her duties, only to be overcome by the fumes. She again had to leave work. The next day Johnson visited her doctor, who prescribed new medications for her and told her that she could not continue her custodial duties. Based on her doctor's advice, she did not return to work.

On December 13, 1999, Johnson submitted a Formal Request for Counseling to the Office of Compliance, stating that she had requested an accommodation for her asthma condition, that AOC had denied that request and thereby violated the ADA, and that she was requesting AOC to provide her an accommodation consistent with her doctor's recommendation. On January 13, 2000, the Office of Compliance notified Johnson of the expiration of her counseling period. The next day, Johnson's representative requested mediation.

During the following three months, Johnson and her representative attempted to find another position for her with AOC. During this time, Johnson did not return to work, used all of her annual and sick leave, and was then classified as absent without leave.

In March of 2000, AOC determined that it would offer Johnson a temporary position as a subway operator. This particular position was previously held by a daytime employee who had been temporarily assigned to work as a receptionist until the receptionist position could be filled by a permanent employee. The subway operator position was classified as a wage grade ("WG-") 3 whereas Johnson's custodial position was classified as a WG–2. AOC offered Johnson the subway operator position at a WG–2 pay rate and as a temporary assignment until the incumbent returned from her detail work as a receptionist. Johnson accepted the offer and has been working as a subway operator ever since, due in part to the fact that the incumbent subway operator was permanently hired to fill the receptionist position. The subway operator job does not aggravate Johnson's asthma and she has had no difficulty performing the duties of this position. Indeed, it is undisputed that Johnson performed her work as a subway operator "in an excellent manner." Initial Decision at 40.

II

On August 21, 2000, Johnson filed a complaint with the Office of Compliance against AOC, seeking back pay, compensatory damages, attorney fees, and costs. Johnson also sought to have her temporary position as a subway operator made permanent. After discovery, a hearing, and post-hearing briefing, the Hearing Officer issued a ruling in favor of Johnson. *Id.* at 60–67. In its decision, the Hearing

Officer concluded that: Johnson was disabled within the meaning of the ADA and had requested a reasonable accommodation; she was qualified to perform the essential functions of the job at issue; she had suffered an adverse employment decision because of her disability; and a reasonable accommodation was possible and would not subject AOC to any undue burden. The Hearing Officer also concluded that AOC failed in its duty to engage in the interactive process for trying to find Johnson an accommodation.

Having ruled in Johnson's favor, the Hearing Officer awarded her back pay of $3,924.23 for December of 1999 through March of 2000, compensatory damages of $10,000 for pain and suffering, attorney fees and costs totaling (at that point in time) $47,926.35, and pre- and post-judgment interest. *Johnson v. Office of the Architect of the Capitol*, No. 99–AC–326 (DA) (Office of Compliance June 15, 2001) ("Final Order"). With respect to Johnson's position as a subway operator, the Hearing Officer ordered, *inter alia*, as follows:

> The Office of the Architect of the Capitol (AOC) shall promptly reassign complainant Juanita Johnson to a permanent position as follows.
>
> (a) If the employee ("Debbie") who previously occupied the subway operator position to which complainant is now temporarily assigned ("complainant's current position") is no longer the incumbent of that position, complainant shall be permanently assigned to that position.
>
> (b) If Debbie is still the incumbent of complainant's current position, AOC shall permanently assign complainant to any other subway operator position which is presently funded but does not have a permanent incumbent.

> (c) If Debbie is still the incumbent of complainant's current position and all other funded subway operator positions also have permanent incumbents, AOC shall permanently assign complainant to her current position subject only to the right of Debbie to reclaim that position upon completion of her detail as receptionist for the AOC Deputy Superintendent of Senate Office Buildings. If Debbie does not reclaim that position upon completion of that detail, it shall become fully complainant's without any encumbrance. If Debbie does reclaim that position upon completion of such detail, AOC shall provide complainant with a temporary duty assignment of at least 120 days and shall engage with her in an interactive process to identify vacant, funded positions within AOC which she may be qualified to fill. AOC shall then permanently reassign complainant to such a position, giving primary, but not controlling, consideration to her preference among available positions.

*Id.* at 1–2.

AOC appealed to the Board, which affirmed the Hearing Officer's findings and conclusions that Johnson was disabled within the meaning of the ADA and that AOC should be ordered to continue Johnson's reassignment as a subway operator. *Johnson v. Office of the Architect of the Capitol*, No. 99–AC–326 (DA), slip op. at 5–6 (Office of Compliance Feb. 25, 2002) ("Decision of the Board of Directors"). The Board focused in particular on AOC's practice of making temporary assignments for injured workers. Specifically, the Board determined that:

> [t]he evidence indicates that the Appellant has a practice of making long-term "temporary" assignments and perhaps this is the best the Appellant can do for Appellee at the present time. In that event, the Appellant's continuing duty to

provide reasonable accommodation would require an inquiry as to whether the Appellee could be reassigned to another position if Appellee's temporary reassignment is terminated.

*Id.* at 6. The Board further noted that AOC makes exceptions to its policy of requiring workers to compete for permanent higher graded positions and that AOC does not appear to have used a competitive process when making temporary assignments to its subway operator positions. *Id.*

The Board was not, however, in complete agreement with the Hearing Officer's ruling. In particular, the Board was "concerned with the Hearing Officer's decision to require [AOC] to reassign [Johnson] to the [WG–3] subway operator position at the WG–2 pay grade" because "the ADA does not require an employer to promote an employee with a disability to satisfy its duty of reasonable accommodation." *Id.* The Board expressed "serious reservations about the appropriateness of forcing an employer to reclassify a position in order to allow for reassignment." *Id.* Ultimately, the Board concluded that its concern was alleviated by a material change in circumstances, namely, the July 20, 2001 settlement of a class action suit against AOC wherein custodial positions were reclassified at the WG–3 level, effective January 23, 1996. *Id.* at 7. The Board then remanded the case for the hearing officer to determine the effect of this settlement. *Id.*

On remand, the parties agreed that Johnson's former custodial position was reclassified as a WG–3 position as a result of the class action settlement and that her increase in pay was retroactive to the extent provided in the settlement agreement.

*Johnson v. Office of the Architect of the Capitol,* No. 99–AC–326 (DA), slip op. at 2 (Office of Compliance July 25, 2002) ("Decision Upon Remand"). The Hearing Officer subsequently concluded that "permanently assigning [Johnson] to the subway operator position is an entirely reasonable accommodation, that it does not constitute an undue hardship for AOC, and that such a remedy is consistent with the goals and policies of the ADA and with the February 25, 2002 decision of the Board in this matter." *Id.* at 6. The Board's decision was based in large part on the lack of any evidence of undue hardship to AOC, particularly with respect to AOC's contention that it did not desire to fill subway operator positions on a permanent basis, see *id.* at 4, and the lack of evidence that a particular number of subway operator positions had permanent incumbents, see *id.* at 6. The Hearing Officer affirmed the previous award of back pay, damages, and attorney fees, and also awarded additional attorney fees and costs of $32,485.50 incurred by Johnson since the remand.[1] *Johnson v. Office of the Architect of the Capitol,* No. 99–AC–326 (DA) (Office of Compliance July 25, 2002) ("Final Order After Remand").

AOC again appealed to the Board, which summarily affirmed the Hearing Officer's remand decision. *Johnson v. Office of the Architect of the Capitol,* No. 99–AC–326 (DA) (Office of Compliance Nov. 20, 2002). AOC now petitions this court for review of the Board's November 20, 2002 decision. We have jurisdiction to consider AOC's petition under 2 U.S.C. § 1407(a). "The court shall set aside a final decision of the Board if it is determined that the decision was—(1) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance

---

1. The Board later awarded additional fees and costs of $30,709.69 on October 10, 2002, and $19,404.73 on January 7, 2003.

with law; (2) not made consistent with required procedures; or (3) unsupported by substantial evidence." 2 U.S.C. § 1407(d) (2000).

## DISCUSSION

■■■ The ADA prohibits an employer from discriminating against an individual with a disability who, with reasonable accommodation, can perform the essential functions of a job, unless the employer can demonstrate that the accommodation would impose an undue hardship on the operation of the employer's business.[2] *See* 42 U.S.C. §§ 12112(a), (b)(5)(A) (2000). A plaintiff claiming a violation of the ADA must make a *prima facie* showing that: (1) she is disabled within the meaning of the ADA; (2) she is qualified (with or without reasonable accommodation) to perform the essential functions of the job at issue; (3) she has suffered an adverse employment decision because of her disability; and (4) a reasonable accommodation is possible. *See, e.g., Cravens v. Blue Cross & Blue Shield,* 214 F.3d 1011, 1016 (8th Cir.2000). Then, while the plaintiff at all times retains the burden of proving that she has been the victim of illegal discrimination, the burden of production shifts to the employer to show that it is unable to accommodate the plaintiff without undue hardship. *Id.*[3] The employer's duty to reasonably accommodate a disabled employee includes job restructuring, reassignment of the employee to a vacant position for which she is qualified, and other similar accommodations. *See* 42 U.S.C. § 12111(9)(B).

At issue in this case is whether a reasonable accommodation of Johnson was available. In particular, AOC's petition identifies two alleged errors by the Board.[4] The first error is with respect to the monetary component of the Board's decision. According to AOC, the Board erred by continuing to award Johnson back pay, compensatory damages and pre-remand attorney fees when the only basis for Johnson's entitlement to the subway operator position is the class action settlement that changed Johnson's former custodial position from a WG–2 to a WG–3 level. Prior to this settlement, argues AOC, Johnson had no entitlement to a WG–3 subway operator position and no other suitable position was available. Because no reasonable accommodation was thus available, according to AOC, it concludes that Johnson is not entitled to back pay or compensatory damages. And, because Johnson was not a prevailing party prior

---

**2.** The Congressional Accountability Act provides that Title I of the ADA applies to the legislative branch of the Federal Government. *See* 2 U.S.C. § 1302 (2000).

**3.** We note that different circuits have framed the parties' respective burdens in different ways, see *Reed v. LePage Bakeries, Inc.,* 244 F.3d 254, 258 (1st Cir.2001), and that the Supreme Court recently stated that in the context of summary judgment, the appropriate standard is that the employee "need only show that an 'accommodation' seems reasonable on its face, i.e., ordinarily or in the run of cases.... Once the plaintiff has made this showing, the defendant/employer then must show special (typically case-specific) circumstances that demonstrate undue hardship in the particular circumstances." *US Airways, Inc. v. Barnett,* 535 U.S. 391, 402, 122 S.Ct. 1516, 152 L.Ed.2d 589 (2002). *Cravens* was applied by the Hearing Officer, *see* Initial Decision at 36, and the parties neither argue that it was erroneous for him to have done so nor suggest that we should apply a different standard.

**4.** In addition to these two errors, AOC also takes issue with the Hearing Officer's determination that AOC failed to engage in the interactive process. We do not reach this issue, as we resolve this case on the basis that substantial evidence shows that a reasonable accommodation was possible without causing AOC an undue burden.

to the remand, AOC argues that Johnson is not entitled to the attorney fees or costs awarded by the Hearing Officer's Final Order.

AOC's second argument deals with Johnson's entitlement to a permanent assignment as a subway operator. AOC does not dispute that Johnson would have been entitled to a permanent subway operator position as a result of the settlement had it not allegedly discharged its duty to accommodate Johnson by offering her a position as an elevator operator, an offer which she declined. The elevator operator position was a reasonable accommodation, argues AOC, that Johnson should have accepted.

We address each of AOC's two arguments in turn.

## I

We first address AOC's argument that the Board should not have affirmed the award of back pay, compensatory damages, and pre-remand attorney fees because no reasonable accommodation was available in December 1999.[5] According to AOC, there were no non-custodial WG–2 positions at that time and placing Johnson into a higher-level position such as a subway operator would have required a promotion from a WG–2 to a WG–3 level. Alternatively, AOC contends that reclassifying a subway operator position at a WG–2 level would have required the creation of a new position. AOC argues that neither of these alternatives is required by the ADA, and in any event, there were no vacant subway operator positions that it

could have offered to Johnson in December of 1999.

A. Substantial evidence shows that placing Johnson in a subway operator position did not require a promotion.

■ Several circuits have stated that an employer is not required to promote a disabled employee in order to provide a reasonable accommodation. *See, e.g., Malabarba v. Chi. Tribune Co.*, 149 F.3d 690, 699 (7th Cir.1998); *Cassidy v. Detroit Edison*, 138 F.3d 629, 634 (6th Cir.1998); *Shiring v. Runyon*, 90 F.3d 827, 832 (3d Cir.1996). We agree. Here, however, the Hearing Officer concluded that placing Johnson in a subway operator position was not a promotion. Initial Decision at 55.

This conclusion is supported by substantial evidence in the record. Specific examples presented at the hearing show that the AOC frequently moves employees between positions without changing their pay or wage grade classification. This fluidity can occur, for example, when an employee is temporarily assigned to another position that has become vacant for one reason or another. Such a "detail" occurred when a subway operator was assigned to fill a recently vacated, higher-graded receptionist position. In addition, one witness testified that AOC has lost a large percentage of workers due to retirement, resulting in a "man shortage" and requiring AOC to "utilize people in the limited duty, of giving them some tasks on a temporary [basis], in places we never do [sic] before." Sometimes higher-graded mechanics were detailed to drive the subways when no one else was available. AOC will also place injured employees into light-duty positions

---

**5.** It is unclear whether AOC agrees with the Hearing Officer's conclusion that Johnson's first request for accommodation was made in October of 1999, thus triggering a duty to accommodate Johnson that month. Our

analysis does not depend on whether AOC should have attempted to find Johnson another position in October or December because the backpay award only covered a period beginning in December.

without changing their pay or wage grade.[6] Moreover, AOC's written Career Staffing Policy governing its competitive hiring process has numerous exclusions and exceptions, including assignments by patronage, employees paid at Davis–Bacon rates, exempt positions for executives, summer employment, intern programs, and various "positions excluded by direction from higher authority." One of AOC's witnesses testified that the individual acting as the Architect of the Capitol can do whatever he wants in assigning employees to various positions.

AOC's classification of the subway operator position has been particularly arbitrary and fluid. At one point in time, many of the positions were classified at a WG–5, but were later reduced to WG–3, and AOC even considered classifying the position at a WG–2. Indeed, the Hearing Officer characterized AOC's staffing of the position as "something of a hodge podge." Initial Decision at 10. AOC's frequent departures from its wage grade classification system for the subway operator position is further shown by the fact that it made just such a departure for Johnson: in March 2000 it placed her into a WG–3 subway operator position at a WG–2 rate.

The evidence regarding AOC's fluid practice of placing employees in different positions without changing their wage grade classification, as well as the fact that in March of 2000 AOC voluntarily assigned Johnson to a WG–3 subway operator position at a WG–2 salary, leads us to conclude that substantial evidence supports the Hearing Officer's finding that it was not necessary to promote Johnson in order to place her in a subway operator position. We do not mean to suggest, however, that as a general rule an employer is obligated to place a disabled employee into a higher level position at his existing pay rate as a reasonable accommodation. Rather, on the record before us, we find that there was substantial evidence supporting the Hearing Officer's conclusion that placing Johnson in a subway operator position did not require a promotion.

Moreover, the fact that a possible accommodation may conflict with an employer's workplace rules and policies does not necessarily mean that such an accommodation is not reasonable. In *US Airways, Inc. v. Barnett*, 535 U.S. 391, 122 S.Ct. 1516, 152 L.Ed.2d 589 (2002), the Supreme Court concluded that an employer was not automatically exempted from compliance with the ADA simply because of a conflict with the employer's established seniority system. US Airways argued that placing a disabled employee into a position that would otherwise be filled by a more senior employee would be granting the disabled employee preferential treatment because of his disability, something the ADA does not require. The Court rejected U.S. Airways' argument:

> While linguistically logical, this argument fails to recognize what the Act specifies, namely, that preferences will sometimes prove necessary to achieve the Act's basic equal opportunity goal. The Act requires preferences in the

---

6. Our reliance on AOC's temporary light-duty program for injured employees should not be construed to mean that we believe an employer must accommodate a permanently disabled employee in the same manner that it accommodates temporarily disabled workers as part of its workers compensation program. *Cf. Dalton v. Subaru–Isuzu Auto., Inc.*, 141 F.3d 667, 680 (7th Cir.1998) ("The ADA does require that SIA make its light-duty program available to disabled employees who are recuperating from temporary restrictions and are otherwise qualified to participate."). We express no opinion on this matter. Rather, we rely on AOC's assignment of injured workers as further evidence of the overall fluidity of its wage grade system.

form of "reasonable accommodations" that are needed for those with disabilities to obtain the *same* workplace opportunities that those without disabilities automatically enjoy. By definition any special "accommodation" requires the employer to treat an employee with a disability differently, *i.e.*, preferentially. And the fact that the difference in treatment violates an employer's disability-neutral rule cannot by itself place the accommodation beyond the Act's potential reach. Were that not so, the "reasonable accommodation" provision could not accomplish its intended objective.

*Id.* at 397, 122 S.Ct. 1516. The Court concluded that "[t]he simple fact that an accommodation would provide a 'preference'—in the sense that it would permit the worker with a disability to violate a rule that others must obey—cannot, in and of itself, automatically show that the accommodation is not 'reasonable.'" *Id.* at 398, 122 S.Ct. 1516. Specific to the case at hand, the Court ruled that in cases where compliance with the ADA conflicts with an established seniority system, the seniority system should ordinarily prevail; however, the employee should have the opportunity to show that special circumstances warrant a finding that a particular accommodation is nevertheless reasonable. *Id.* at 405, 122 S.Ct. 1516. Such special circumstances may include:

> that the employer, having retained the right to change the seniority system unilaterally, exercises that right fairly frequently, reducing employee expectations that the system will be followed—to the point where one more departure, needed

to accommodate an individual with a disability, will not likely make a difference. The plaintiff might show that the system already contains exceptions such that, in the circumstances, one further exception is unlikely to matter.

*Id.*

Applying the guidance of *US Airways* to AOC's wage grade classification system,[7] we conclude that Johnson has presented sufficient evidence that special circumstances warrant an additional exception to that system in her case. As we have already discussed, the evidence shows that AOC has the authority to make exceptions to the wage grade classification system and that it has repeatedly exercised that authority. In addition to the evidence already discussed, there is evidence that in September of 2000, nearly one year after Johnson's first request for an accommodation and six months after she was temporarily assigned to a subway operator position, AOC converted a WG–3 subway operator position into a permanent WG–2 position in order to accommodate an employee with carpel tunnel system, thus showing yet one more exception to AOC's wage grade classification system.[8] Moreover, "AOC has not proven that its Career Staffing Policy has been consistently applied or that reassignment of Mrs. Johnson to a position for which she is qualified would conflict with that policy." Initial Decision at 58. Indeed, the very fact that AOC placed Johnson into a subway operator position in March 2000 shows that yet "one further exception"

---

7. Other circuits have interpreted *US Airways* to apply to an employer's policies other than a seniority system. *See, e.g., Giebeler v. M&B Assocs.,* 343 F.3d 1143 (9th Cir.2003); *Shapiro v. Township of Lakewood,* 292 F.3d 356 (3d Cir.2002).

8. As previously stated, we express no opinion as to whether Johnson was entitled to the same accommodations given to employees under AOC's workers compensation program. Rather, the fact that AOC reclassified this position is simply evidence of its ability to do so.

to AOC's already flexible wage grade classification system is "unlikely to matter." *US Airways*, 535 U.S. at 405, 122 S.Ct. 1516. The evidence therefore supports the Hearing Officer's conclusion that Johnson "has plainly shown that permanent assignment to the subway operator [position] seems reasonable on its face." Decision Upon Remand at 5.

AOC, for its part, presented insufficient responsive evidence to show that placing Johnson in a WG–3 subway operator position presents an undue burden. *Id.* at 5–6. The evidence instead shows just the opposite, that placing Johnson in the subway operator position was of significant benefit to AOC:

> The reason for [assigning Johnson to drive the subway in March of 2000] is we needed someone to perform that task because we were having journeyman-level mechanics perform that task, and that clearly didn't make sense.... Well, it doesn't make business sense to take someone at $25 an hour to drive a subway car. When there's mechanic-level work they can be performing, we should—you know, that employee should be working at his highest potential, not at his lowest potential. So it makes sense for an appropriately graded subway car driver to drive a subway car and an appropriately graded mechanic to do mechanic work.

The Hearing Officer thus concluded that "AOC cannot demonstrate, and has not really argued, that transferring complainant to another position for which she is qualified would impose undue hardship in the form of excessive costs." Initial Decision at 49. AOC does not challenge this finding on appeal, nor does it identify any other evidence of undue burden sufficient to overcome the evidence that AOC repeatedly makes exceptions to its wage grade classification system and that it would not have been unreasonable to make yet one more exception (to the extent one was even necessary) to accommodate Johnson.

**B. Johnson's subway operator assignment did not require AOC to create a new position.**

■ AOC argues that it was not required to offer Johnson a WG–3 position at her existing salary because to do so would have resulted in the *de facto* creation of a new position (a WG–2 subway operator position). AOC relies on three cases to support its position: *Shiring*, 90 F.3d at 831; *Bracey v. Office of Personnel Management*, 236 F.3d 1356, 1361–62 (Fed.Cir. 2001); and *Hoskins v. Oakland County Sheriff's Department*, 227 F.3d 719, 729–30 (6th Cir.2000). While AOC is generally correct that an employer is not required to create a new position to accommodate a disabled employee, these cases do not address the particular issue before us, which is whether assigning Johnson to a subway operator position at her existing pay rate constitutes a "new" position. In *Shiring*, for example, the Postal Service assigned a disabled employee to perform mail casing, which was normally performed by the letter carriers. This casing job was not an official position, but had been created by the Postal Service to give Shiring something to do on a temporary basis. The court therefore concluded that the Postal Service was not required to permanently assign Shiring to perform casing because "employers are not required to create positions specifically for the handicapped employee." *Shiring*, 90 F.3d at 831. Likewise, *Hoskins* concluded that converting a position that was normally filled on a rotating basis to a position filled only by the disabled employee was effectively the creation of a new position. 227 F.3d at 729. *Bracey*, for its part, addressed the issue of eligibility for disability retirement under

the Civil Service Retirement System, and is not pertinent to the issue before us now.[9]

Johnson's situation is different from both *Shiring* and *Hoskins*. AOC did not pull together duties from other positions to keep Johnson occupied, as in *Shiring*. Rather, the subway operator position is an "official" AOC position that existed prior to her becoming disabled and it continues to exist to this day. Likewise, AOC has not identified any evidence that Johnson displaced other workers who were filling a particular position on a rotating basis, as in *Hoskins*.[10] AOC has thus identified no case law indicating that, under the circumstances in Johnson's case, placing an employee into a higher wage grade position but at the existing employee's rate of pay would constitute the creation of a new position. Nor has AOC identified evidence in the record to support such a contention. Rather, the evidence shows that there are a finite number of subway operator positions and that Johnson filled one of those already-existing positions while being paid less than the other drivers.

### C. Substantial evidence shows that at least one subway operator position was vacant in December 1999.

The Hearing Officer concluded that there are a total of twelve subway operator positions in the House and Senate.[11] Initial Decision at 9–10. Out of those twelve positions, the Hearing Officer concluded that, at most, only three of those positions were encumbered. *Id.* at 40. This conclusion is supported by substantial evidence. One of the three encumbered positions was occupied by the employee ("Debbie") who left to fill a detail assignment as a receptionist; this subway operator position was filled by Johnson in March of 2000 but was still encumbered to the extent that Debbie could have returned to the position had she not been, eventually, permanently hired as a receptionist. Another position was held by Florine Washington, who was initially assigned to fill that position in a light duty capacity because she was suffering from carpel tunnel syndrome; AOC eventually converted her position into a permanent one. A third position was held for two years on a light-duty basis by another injured employee, Gary Boddie.

As for the remaining subway operator positions, AOC claims that these positions are designated temporary light-duty positions to be filled by employees who have been injured on the job. According to AOC, an employer is not required to convert a temporary light-duty position to a permanent position in order to accommodate a disabled employee. Certainly there is case law to support AOC's position:

> The ADA does not compel an employer to reduce the number of bona fide temporary jobs it has set aside in con-

---

9. In this regard, we note that when considering whether a temporary light-duty assignment for a disabled employee constituted a "vacant position," *Bracey* relied on the statutorily mandated " 'position-classification system' [that] is 'used in all phases of personnel administration.' " 236 F.3d at 1359 (quoting 5 U.S.C. § 5101(2)). AOC, unlike the executive branch of the government, is not subject to this statutory classification regime and, as one of its witnesses indicated, is free to re-grade and modify positions at will.

10. Nor, as discussed in the next section, nor was there evidence that all of the subway operator positions were either permanently encumbered or designated for temporary light-duty assignments.

11. On remand, there was some debate as to whether there were twelve positions or nine, based on the number of trains and shifts in a twenty-four hour period. Regardless of whether there were actually nine or twelve positions, our analysis and conclusions remain the same.

junction with a program like the one contemplated by the state worker's compensation statute and to convert them to permanent positions for its disabled employees. The ADA does require that SIA make its light-duty program available to disabled employees who are recuperating from temporary restrictions and are otherwise qualified to participate.

*Dalton v. Subaru–Isuzu Auto., Inc.*, 141 F.3d 667, 680 (7th Cir.1998). The Third Circuit, however, has concluded somewhat differently:

We are reluctant to adopt a per se rule that the conversion of a temporary job to a permanent job can never constitute a "reasonable accommodation" under the Rehabilitation Act. We think that in most cases the imposition of such a requirement will be unreasonable, but there might arise the rare case in which the cost of converting the temporary job into a permanent one is slight and the benefits considerable.

*Mengine v. Runyon,* 114 F.3d 415, 418–19 (3d Cir.1997). We do not decide here which standard should apply for reasons discussed in the next paragraph, but note that one AOC witness testified that it cost AOC nothing to place Johnson in the subway operator position at a WG–2 rate, but rather provided AOC the considerable benefit of saving it from paying a higher salary to someone else for the same service, thus indicating that it would indeed be more than reasonable to convert Johnson's temporary assignment into a permanent one.

More importantly, the Hearing Officer found that "[w]hile AOC contends that its management might not wish to fill subway operator positions on a permanent basis, there is no evidence to that effect." Decision Upon Remand at 4. Having reviewed the record, not only do we agree with the Hearing Officer, but we find that the evidence in fact contradicts AOC's contention that the remaining subway operator positions are designated for light duty. One AOC witness specifically refuted AOC's contention:

Q. Okay. But I understand that that's something [the subway operator position] that's frequently filled by a detail of someone on light duty.

A. No, that's not true.

Q. Not true?

A. No, it's not always. It has [been] done—we had—in the last year and a half, two years, we've had almost 150 people who have retired through buyouts, et cetera. And they have attempted to do, because of the tremendous reduction of work force, and with—if you have only—you have 1,910 employees, and you have almost 200 employees, 150 employees, lets say. A number of these positions have created vacancies, and we've had man shortage. So we have attempted to utilize people in the limited duty, of giving them some tasks on a temporary, in places we never do before. That's the thought here.

Moreover, Johnson testified that another subway operator on her shift was a mechanic helper because "they're short" of drivers, which is consistent with the testimony of another AOC witness that they used "journeyman-level mechanics to assist in driving the subway car" as well as "mechanic's helpers." AOC's contention is further undermined by the fact that AOC produced a document on remand showing that, at the time of the initial hearing, AOC had posted a vacancy for a permanent subway operator position. AOC posted yet another vacancy for a permanent subway operator position in 2001. AOC never informed Johnson about either of these vacancies and filled one of them with a WG–2 custodian.

Thus, substantial evidence supports the conclusion that of the twelve subway operator positions, at least one of them was more likely than not vacant in December 1999. AOC, who is in the best position to know how its positions are filled, has failed to produce sufficient evidence to the contrary. We therefore agree with the Hearing Officer's conclusion that "the preponderance of the evidence indicates that one or more subway operator positions was vacant at the time of complainant's request for reasonable accommodation." Initial Decision at 40.

### D. Johnson has carried her burden of proving that a reasonable accommodation was possible.

We have concluded thus far that substantial evidence supports the Hearing Officer's findings that there was at least one vacant subway operator position in December 1999 and that Johnson could have been assigned to that position without a promotion and without creating a new position. Johnson has therefore made a *prima facie* case that a reasonable accommodation was possible. *See Benson v. Northwest Airlines*, 62 F.3d 1108, 1112 (8th Cir.1995) ("[O]nce the plaintiff makes 'a facial showing that reasonable accommodation is possible,' the burden of production shifts to the employer to show that it is unable to accommodate the employee."). Even so, Johnson's case is not without its difficulties, given the fact that the subway operator positions were classified at a WG–3 or higher. We recognize that an employer is not required to promote a disabled employee, to create a new position, or to violate any legitimate, nondiscriminatory policy of the employer in order to provide a reasonable accommodation. Under our deferential standard of review, however, we are compelled to agree with the Hearing Officer that none of these circumstances is present in this

case. *See Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 619, 86 S.Ct. 1018, 16 L.Ed.2d 131 (1966) ("The possibility of drawing two inconsistent conclusions does not prevent an administrative agency finding from being supported by substantial evidence. . . ."). Moreover, the evidence in this case of the numerous exceptions to, and overall fluidity of, AOC's wage grade classification system leads us to conclude that, under *US Airways*, AOC should have made one more exception in Johnson's case and that it would not have been an undue burden on AOC to do so.

We therefore find that AOC improperly denied Johnson a reasonable accommodation during the period between December 1999 and March 2000 because she could have been appointed to a vacant subway operator position without the need for promotion or the creation of a new position.

## II

Our holding that AOC improperly denied Johnson a reasonable accommodation, thereby entitling her to relief for the period between December 1999 and March 2000, does not, however, address AOC's challenge to the Board's grant of prospective relief. After Johnson's case was remanded by the Board for consideration of the effect of the 2001 class-action settlement, which retroactively classified Johnson's custodial position as a WG–3, AOC offered Johnson a permanent assignment as an elevator operator. Johnson declined this position based on her doctor's advice. On this basis, AOC challenges the Board's decision after remand that Johnson should be permanently assigned to the subway operator position. AOC does not dispute that a permanent assignment to the subway operator position as of the date of the class action settlement would have been a reasonable accommodation. Instead, AOC

argues that because Johnson rejected AOC's offer of an allegedly reasonable accommodation, it had no obligation to place Johnson in the subway operator position she desired. *See, e.g., Cravens*, 214 F.3d at 1019 ("[T]he employer is not obligated to provide the accommodation requested or preferred by the employee; the reassignment need only be a 'reasonable' accommodation.").

The Hearing Officer concluded that the elevator operator position was not a reasonable accommodation because "[b]eing in a small, confined space 40 hours per week with people who frequently wear perfume (or cologne) and who occasionally smoke in the elevator, despite posted no-smoking signs, is inconsistent with [Johnson's] medical condition and against her doctor's advice." Decision Upon Remand at 4. This conclusion is supported by substantial evidence. In making this determination, the Hearing Officer considered Johnson's testimony about why she believed her condition would be aggravated by working in an elevator. Johnson testified in particular about having to leave a doctor's office when a woman who had been smoking sat next to her. She also described having an asthma attack in a car due to a passenger wearing perfume. The Hearing Officer additionally considered the pre-remand testimony of two physicians regarding the conditions that could trigger Johnson's asthma, including strong odors, as well as a recent letter from one of those physicians advising that she not take the elevator operator position. Notably, AOC presented no medical evidence of its own that the elevator operator position would not aggravate Johnson's condition. On this record, we conclude that substantial evidence supports the finding that the elevator operator position would not have been a reasonable accommodation because it would have aggravated Johnson's disability.

## CONCLUSION

Substantial evidence supports the findings of the Hearing Officer that in December (or October) of 1999 there was more likely than not at least one vacant subway operator position and Johnson could have been reasonably accommodated by placing her in one of those positions without a promotion and without the creation of a new position. Moreover, AOC was required under *Barnett* to make one more exception (to the extent an exception was even necessary) to its already fluid and flexible wage grade classification system in order to accommodate Johnson. AOC's attempt to accommodate Johnson by instead offering her a permanent position as an elevator operator was not reasonable, because substantial evidence shows that such a position would have aggravated Johnson's disability. We therefore affirm the decision of the Board awarding Johnson back pay, damages, attorney fees, costs, interest, and a permanent position as a subway operator.

*AFFIRMED.*