RIPPLE, Circuit Judge,
dissenting.
Because I believe that the summary-judgment record reveals genuine issues of material fact concerning United’s failure to reasonably accommodate Mr. Dunderdale’s disability and United’s responsibility for *858 the breakdown in the interactive process, I respectfully dissent.
I.
As my colleagues note, Mr. Dunderdale submits that United could have accommodated him by allowing him to remain in a Matrix position — an option they reject based on US Airways, Inc. v. Barnett, 535 U.S. 391, 122 S.Ct. 1516, 152 L.Ed.2d 589 (2002). Barnett does not require this result.
In Barnett, the Court was asked “how the [ADA] resolves a potential conflict between (1) the interests of a disabled worker who seeks assignment to a particular position as a ‘reasonable accommodation,’ and (2) the interests of the other workers with superior rights to bid for the job under an employer’s seniority system.” 535 U.S. at 393-94, 122 S.Ct. 1516. The Court held that, in the mine run of cases, if a request to transfer disrupts an established seniority system, it is not a “reasonable” accommodation: “The statute does not require proof on a case-by-case basis that a seniority system should prevail. That is because it would not be reasonable in the run of cases that the assignment [of the disabled employee] in question trump the rules of a seniority system. To the contrary, it will ordinarily be unreasonable for the assignment to prevail.” Id. at 403, 122 S.Ct. 1516. The court then offered the following explanation:
Most important for present purposes, to require the typical employer to show more than the existence of a seniority system might well undermine the employees’ expectations of consistent, uniform treatment — expectations upon which the seniority system’s benefits depend. That is because such a rule would substitute a complex case-specific “accommodation” decision made by management for the more uniform, impersonal operation of seniority rules. Such management decisionmaking, with its inevitable discretionary elements, would involve a matter of the greatest importance to employees, namely, layoffs; it would take place outside, as well as inside, the confines of a court case; and it might well take place fairly often. We can find nothing in the statute that suggests Congress intended to undermine seniority systems in this way. And we consequently conclude that the employer’s showing of violation of the rules of a seniority system is by itself ordinarily sufficient.
Id. at 404-05, 122 S.Ct. 1516 (citation omitted).
The Court observed, however, that the plaintiff “remain[ed] free to show that special circumstances warranted] a finding that, despite the presence of a seniority system ... the requested ‘accommodation’ is ‘reasonable’ on the particular facts.” Id. at 405, 122 S.Ct. 1516. For instance, the Court suggested, a plaintiff might show “that the employer, having retained the right to change the seniority system unilaterally, exercises that right fairly frequently, reducing employee expectations that the system will be followed — to the point where one more departure, needed to accommodate an individual with a disability, will not likely make a difference.” Id. The plaintiff also “might show that the system already contains exceptions such that, in the circumstances, one further exception is unlikely to matter.” Id. The Court expressly noted that it did “not mean these examples to exhaust the kinds of showings that a plaintiff might make.” Id.; cf. Tobin v. Liberty Mut. Ins. Co., 553 F.3d 121, 127-28 (1st Cir.2009) (holding that the plaintiff had met his burden of showing that employer’s “performance *859 eligibility criteria” for assignment of accounts fell within the “special circumstances” exception of Barnett because criteria were not strictly followed and, therefore, deviating from those criteria would not have “frustrated any individual’s expectation of receiving” an assignment); Office of the Architect of the Capitol v. Office of Compliance, 361 F.3d 633, 642 (Fed.Cir.2004) (holding that plaintiff had established “sufficient evidence that special circumstances warranted]” a deviation from “AOC’s wage grade classification system” where “the evidence show[ed] that AOC ha[d] the authority to make exceptions to the wage grade classification system and that it ha[d] repeatedly exercised that authority”).
Here, Mr. Dunderdale has established such special circumstances. From (at least) the time that Mr. Dunderdale returned to work with restrictions in 2005, until United implemented the new bidding process in 2011, United made exceptions to the seniority system for employees with physical restrictions by reserving the Matrix positions for them. The expectation of ramp service employees, therefore, was that there was one area that was not subject to the general seniority bid process. It was United’s action in changing that approach that disrupted the employees’ expectations.
According to the majority, however, “[o]nce United opened the Matrix position to the seniority bidding system, all of the ramp serviceman received an expectation of unilateral, consistent treatment regarding bidding for that position.” Op. at 855. At bottom, the opinion suggests that, despite an employer’s established practice of deviating from a seniority system, it may decide, at any time, to require strict adherence to that system.[1] Moreover, when an employer makes that unilateral decision, an employee may not point to the employer’s history of deviations to establish special circumstances for purposes of Barnett. I do not believe this approach can be reconciled with Barnett. The Court in Barnett clearly anticipated that an employer’s past practice of deviating from a seniority system could establish special circumstances. If an employer were able to negate the impact of its past practices simply by announcing a new policy of strict adherence to a seniority system, the exception created by Barnett would be illusory.
My colleagues also rely on our decision in Gratzl v. Office of the Chief Judges of the 12th, 18th, 19th, and 22nd Judicial Circuits, 601 F.3d 674, 680 (7th Cir.2010), for the proposition that “employers do not have to maintain positions or job structures that provide reasonable accommodations if the employer finds, for legitimate business reasons, that the position or job *860 structure should be eliminated.” Op. at 855-56. Gratzl, however, has little bearing on the case before us.
In Gratzl, a court reporter, who suffered from incontinence, had been employed as a “Court Reporting Specialist,” a position that did not require her to perform courtroom reporting duties. A few years later, “[t]he State of Illinois eliminated the ‘Court Reporting Specialist’ job title and consolidated all reporters under the title ‘Official Court Reporter,’ ” id. at 677, a position that required courtroom reporting duties. Gratzl refused numerous accommodations offered by the court and, instead, brought an ADA action in which she claimed that her employer had failed to reasonably accommodate her when it refused to assign her only to non-courtroom duties. In evaluating her claim, we first determined that Gratzl was not a qualified individual with a disability. In doing so, we rejected Gratzl’s argument that, because she could perform the functions of a “Court Reporting Specialist,” she also could perform the duties of an “Official Court Reporter”:
Gratzl cannot prove that she is qualified for her current job simply by citing evidence that she was qualified for a previous job, with different essential functions, that has been eliminated. Gratzl is unable to sit in the courtroom during proceedings without disrupting court; she has offered no evidence to the contrary and, in fact, her refusal to consider any accommodation that required that she do in-court reporting strongly suggests that she believed she was incapable of performing this function. Therefore, she is not qualified for the job.
Id. at 680. Looking at the question another way, we held that Gratzl’s requested accommodation — “exclusive assignment to the control room” — was not reasonable because “[a]n employer need not create a new job or strip a current job of its principal duties to accommodate a disabled employee.” Id. (citing Ammons v. Aramark Uniform Servs., Inc., 368 F.3d 809, 819 (7th Cir.2004)).
Putting aside the myriad of other factual distinctions between Gratzl and the present case, Mr. Dunderdale is not requesting that United create a new job' or strip a current job of its principal duties; the Matrix position continues to exist, and Mr. Dunderdale is not requesting any change in its duties. Instead, the accommodation that he seeks is to be allowed to bid for that existing position on the same terms as he did prior to 2011.
II.
I also would hold that Mr. Dunderdale has raised a genuine issue of material fact with respect to the breakdown in the interactive process. The majority opinion faults Mr. Dunderdale for simply “repeating his request for a no-bid position,” for failing to respond to two invitations to participate in “RAP” sessions in August and November of 2011, and for failing to “search Skynet for job openings while he was receiving benefits on EIS.” Op. at 857. As we have noted, however, “[t]he last act in the interactive process is not always the cause of a breakdown, ... and the courts must examine the process as a whole to determine whether the evidence requires a finding that one party’s bad faith caused the breakdown.” EEOC v. Sears, Roebuck & Co., 417 F.3d 789, 806 (7th Cir.2005). Under the circumstances presented here, I believe a jury reasonably could conclude that United, not Mr. Dunderdale, was re- ' sponsible for the breakdown in the interactive process.
Mr. Dunderdale was informed in April 2011 that, because of his lack of seniority, he had not won the bid to work in the Matrix. Thereafter, he met with a United *861 representative and expressed his interest in transferring to another position, specifically one of the “no-bid” positions. Mr. Dunderdale was informed, however, that “the only place [he] was able to work was the Matrix.” R.52-1 (Dunderdale affidavit) at 3.
Following this meeting, United, invited Mr. Dunderdale to participate in two “RAP” sessions, one in August 2011 and one in November 2011. Mr. Dunderdale, however, previously had participated in “RAP” sessions. Mr. Dunderdale states— and United does not contest — that the RAP sessions consisted of Mr. Dunder-dale’s receiving “technical instruction on how to perform searches” on United’s Skynet. Id. at 4. As Mr. Dunderdale already had received this instruction, he did not respond to the invitations in August and November.
An employer must take “an active, good-faith role in the interactive process.” Sears, Roebuck & Co., 417 F.3d at 806. To invoke the interactive process, an employee simply needs to say “ T want to keep working for you — -do you have any suggestions?’ ” Miller v. Ill. Dep’t of Corr., 107 F.3d 483, 487 (7th Cir.1997). At that point, “the employer has a duty under the Act to ascertain whether he has some job that the employee might be able to fill.” Id. Specifically,
[fjirst, an employer is required to “identify the full range of alternative positions for which the individual satisfies the employer’s legitimate, nondiscriminatory prerequisites.” Next, he must “determine whether the employee’s own knowledge, skills, and abilities would enable her to perform the essential functions of any of those alternative positions, with or without reasonable accommodations.” We underscored that an “employer’s duty to accommodate requires it to consider transferring the employee to any of these other jobs, including those that would represent a demotion.”
Hendricks-Robinson v. Excel Corp., 154 F.3d 685, 694-95 (7th Cir.1998) (quoting Dalton v. Subaru-Isuzu Auto., Inc., 141 F.3d 667, 678 (7th Cir.1998)).
United’s efforts on Mr. Dunderdale’s behalf fell far short of these marks. There simply is nothing in the record to support a conclusion that United undertook a comprehensive search for available, alternative positions. United’s response to Mr. Dun-derdale was a perfunctory “no” to his request for a transfer.[2]
My colleagues point to our decision in Weiler v. Household Finance Corp., 101 F.3d 519 (7th Cir.1996), to support their contrary conclusion — that “it was Dunder-dale’s duty to search Skynet for job openings while he was receiving benefits on ’ EIS.” Op. at 857. I do not believe Weiler supports such a broad proposition.
In Weiler, the plaintiff suffered from physical symptoms as well as depression and anxiety, which she attributed to working for a specific supervisor. We held that the plaintiff had not established that she was “disabled” for purposes of the ADA because “[t]he major life activity of working is not ‘substantially limited’ if a plaintiff merely cannot work under a certain supervisor because of anxiety and stress related to his review of her job perform- *862 anee.” Id. at 524. Even assuming, however, that she were disabled, we concluded that her employer had reasonably accommodated her condition. We noted that, in addition to granting her short-term disability, applying for long-term disability benefits on her behalf, and “allowing] her to post for a new position in the company in the same salary grade,” her employer’s personnel manager also “searched for a similar position for her in the company under a different supervisor, but none was available.... [It] even contacted her and offered her alternative available positions within her salary grade and invited her to interview for them.” Id. at 526.
In contrast to the efforts of Weiler’s employer, however, there is no evidence in this record that United management attempted to locate positions for which Mr. Dunderdale was qualified or to facilitate his placement in those positions. On the record before us, a jury reasonably could conclude that United made no effort to transfer Mr. Dunderdale, but simply pointed him to a website and required him to do the rest. Under our case law — including Weiler — this is not a sufficient response.
We have noted that “[n]o hard and fast rule will suffice” for attributing blame for the breakdown of the interactive process. Beck v. Univ. of Wis. Bd. of Regents, 75 F.3d 1130, 1135 (7th Cir.1996). “Rather, courts should look for signs of failure to participate in good faith.... A party that fails to communicate, by way of initiation or response, may also be acting in bad faith.” Id. Here, there is evidence from which a jury reasonably could conclude that United’s lack of response to Mr. Dun-derdale’s request to be transferred caused the breakdown in the interactive process.
For these reasons, I respectfully dissent.

. The majority states that United made the decision to adhere strictly to the seniority system "[o]nly when members of the Union began to question their inability to bid for the [Matrix] positional.” Op. at 855. The record reveals, however, that Debra DiSantis, former Manager of Performance and Labor for United’s O'Hare operation, received questions from employees with physical restrictions about how they could bid into the Matrix area; she testified that "[t]he union would ask questions, employees would come in and say, 1 wanna work in there because I can’t do this or that,’ so lots of people came to see me about things, and that was a topic I got questions about.” R.52-3 at 13 (DiSantis Dep. 48). Her actions were not in response to any specific grievances; indeed, she could not remember any grievances being filed with respect to the prior bidding process for the Matrix. Moreover, she was "not being pressured by anybody” to change the bidding process. Id. at 16 (DiSantis Dep. 59). She simply "found a process that was not following the guidelines as it should and was not working well and I looked for a way to fix that.” Id. (DiSantis Dep. 60).

. Although United does not make this argument, it is possible that it did undertake the comprehensive analysis anticipated by Hendricks-Robinson v. Excel Corp., 154 F.3d 685, 694-95 (7th Cir.1998), but concluded that there were no other positions available for which Mr. Dunderdale was qualified. If that is the case, however, then it also cannot fault Mr. Dunderdale for failing to conduct a search for available positions on its Skynet because such a search would have been futile.