In the

# United States Court of Appeals

## For the Seventh Circuit

No. 14-2911

MICHAEL DUNDERDALE,

*Plaintiff-Appellant*,

*v.*

UNITED AIRLINES, INC.,

*Defendant-Appellee.*

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 12 C 4440 — **Edmond E. Chang**, *Judge.*

ARGUED SEPTEMBER 30, 2015 — DECIDED DECEMBER 03, 2015

Before BAUER, RIPPLE, and ROVNER, *Circuit Judges.*

BAUER, *Circuit Judge.*   Plaintiff-appellant, Michael Dunder-
dale ("Dunderdale"), filed a discrimination action against
defendant-appellee, United Airlines, Inc. ("United"), under the
Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.*,
("ADA"), for failure to accommodate. The district court
granted summary judgment in favor of United, and  Dunder-
dale appealed. For the reasons that follow, we affirm the
district court's ruling.

## I. BACKGROUND

Dunderdale began working for United in April 1997 as a ramp serviceman at O'Hare International Airport. The Collective Bargaining Agreement ("CBA") between United and the International Association of Machinists and Aerospace Workers (the "Union") governs the terms and conditions of employment as a United ramp serviceman. Ramp servicemen bid for placement to different work areas throughout United. Once ramp servicemen bid on their desired work areas, the CBA requires United to place them according to their seniority.

United has a written job description that applies to all ramp servicemen, regardless of their work area. The "Job Functions" of a ramp serviceman are:

> Load[s], stows, unloads mail, cargo and baggage from conveyor belts, carts; trucks and aircraft. Cleans; services aircraft interiors and removes, assembles and installs passenger cabin supplies. Loads unloads buffet and food supplies. Performs aircraft service duties including cleaning windshields, engine oil checks/servicing and deicing functions. Receives positions and dispatches aircraft. Operates and cleans various mechanical machines and ramp equipment related to aircraft services such as radios, aircraft air conditioners, cargo and belt loaders, fork lifts, trucks, tractors, vans and related automotive equipment. Operates computers and printers to enter, access and manage aircraft load manifest data and instructions, color-coded baggage/transfer systems, aircraft fueling or other service information.

The written job description also states that a ramp serviceman's duties involve "pulling, pushing of carts and containers; performs duties in walking, standing, bending, kneeling and stooping positions; lifts freight, baggage and other heavy items - up to 70 pounds."

In December 2002, Dunderdale injured his back at work. Due to his injuries, he did not return to work until February 2004. At that time he did not have any work restrictions, but two weeks after he returned, he injured his back again. As a result, Dunderdale went on leave until June 2005. When he returned, he had several permanent work restrictions. He could not lift more than 30 pounds, he was unable to drive United's vehicles, and he could not bend, stoop, or kneel.

Because of Dunderdale's work restrictions, United assigned him to the Matrix position. At that time, the Matrix position was part of the Product Sort work area. It involves sitting at a computer next to a conveyor belt, scanning the tags on luggage coming down the conveyor belt, and then processing the scans on the computer. In 2005, United's policy was that all ramp servicemen with permanent work restrictions could bid for positions in the Product Sort work area, and then United would assign them to the Matrix position.

In 2007, United decided to separate the Matrix position from the Product Sort work area. As a result, ramp servicemen had to specifically bid for the Matrix position. But, the position was only available to ramp servicemen with permanent work restrictions.

In 2010, United decided to change the bidding policy regarding the Matrix position. Starting in May 2011, all ramp

servicemen could bid for the Matrix position, not just those with permanent work restrictions. Debra DiSantis ("DiSantis"), United's Manager of Performance and Labor, recommended the change. DiSantis stated that the "overarching" reason for the change was to "improve the [bidding] system" by having the Matrix position match the language of the CBA regarding work area placement based on seniority, thereby creating "clear, concise guidelines and directions on the process and policy [of the bidding system]." Although no one had filed a formal grievance prior to this decision, DiSantis was notified by the Union that other ramp servicemen had questioned their inability to bid for the Matrix position.

On April 21, 2011, Sheila Siggal ("Siggal"), United's Supervisor for Performance and Labor Relations, met with Dunderdale. Siggal informed Dunderdale that he no longer had sufficient seniority to retain his position at the Matrix since all ramp servicemen could bid on the position beginning May 2011. As a result, Siggal stated that effective May 2011, United would place Dunderdale on Extended Illness Status ("EIS"). While on EIS, Dunderdale would continue to receive various benefits as a United employee, such as health insurance and access to United's intranet, Skynet, for up to three years. United employees can use Skynet to search and apply for open positions at United.

During the April 21, 2011, meeting, Dunderdale told Siggal that he believed he was able to perform the positions of the Auditor, Bulls-eye, and the Manpower Office. All three are no-bid positions, which means that they are not open for bidding, nor are they placed based on seniority. However, Siggal

informed Dunderdale that there were no open positions for the Auditor, Bulls-eye, or the Manpower Office.

In May 2011, Dunderdale went on EIS. While on EIS, he did not apply for any other position at United. On August 24, 2011, and on November 22, 2011, United sent Dunderdale letters inviting him to participate in Reasonable Accommodation Process ("RAP") sessions. Dunderdale failed to respond to both letters and did not participate in either proposed RAP session.

In October 2011, Dunderdale met with a human resources manager at United because he believed that United had discriminated against him. During this meeting, Dunderdale requested appointment to a no-bid position, but the request was denied.

On June 7, 2012, Dunderdale filed suit against United for discrimination and retaliation under the ADA. On April 15, 2013, Dunderdale had a RAP session with representatives of United and the Union. At this meeting, Dunderdale again requested appointment to a no-bid position, but was again denied. Apart from these two requests, Dunderdale did not seek any other accommodation from United while he was on EIS.

On September 26, 2013, United informed Dunderdale that he had sufficient seniority to regain the Matrix position. Dunderdale returned to work in October 2013 in the Matrix position. On October 18, 2013, United moved for summary judgment on Dunderdale's discrimination and retaliation claims. In response, Dunderdale waived his retaliation claim and instead focused solely on whether United discriminated

against him by failing to reasonably accommodate his disability. On August 4, 2014, the district court granted summary judgment in favor of United. Dunderdale appealed.

## II.  DISCUSSION

The issue before this court is whether it was appropriate to grant summary judgment in favor of United on Dunderdale's ADA claim for failure to accommodate. Summary judgment is appropriate if there is no genuine dispute as to any material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). We review the district court's ruling *de novo*, and examine the record in the light most favorable to the non-moving party. *Kotwica v. Rose Packing Co., Inc.*, 637 F.3d 744, 747 (7th Cir. 2011) (citations omitted).

In order to establish a prima facie ADA claim for failure to accommodate, a plaintiff must establish that: (1) the plaintiff is a qualified individual with a disability; (2) the employer was aware of the disability; and (3) the employer failed to reasonably accommodate the plaintiff's disability. *James v. Hyatt Regency Chicago*, 707 F.3d 775, 782 (7th Cir. 2013) (citation and quotation omitted); *see also* 42. U.S.C. § 12112(b)(5)(A).

United admits Dunderdale was disabled and that it was aware of his disability, so the two issues before the court are: was Dunderdale a "qualified individual" with a disability, and did United fail to reasonably accommodate his disability.

### A.  Whether Dunderdale was a Qualified Individual with a Disability

The ADA defines a "qualified individual" as "an individual who, with or without reasonable accommodation, can perform

the *essential functions* of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8) (emphasis added). To determine what constitutes an essential function of the position, courts consider "the employer's judgment," as well as a "written job description" of the position. *Id*. Also, the United States Equal Employment Opportunity Commission ("EEOC") regulations provide that the essential functions are the "fundamental job duties" of a position, rather than the position's "marginal functions," and that courts should examine several factors to determine essential functions.[1] 29 C.F.R. § 1630.2(n)(1)-(3).

In this case, lifting more than 70 pounds was an essential function of the ramp serviceman position. United's written job description for ramp servicemen expressly states the lifting requirement, as well as illustrates how heavy lifting is a fundamental duty of the position. For example, it lists that ramp servicemen are expected to load and unload mail, cargo, baggage, freight, cabin supplies, buffet supplies, and food supplies, all of which may weigh up to 70 pounds. Thus, Dunderdale's inability to lift more than 30 pounds prevented him from performing the essential functions of the ramp serviceman position without a reasonable accommodation.

---

[1]   Specifically, the EEOC regulations list: (i) the employer's judgment; (ii) written job descriptions; (iii) amount of time spent performing the function; (iv) consequences of not requiring the employee to perform the function; (v) terms of a collective bargaining agreement; (vi) work experience of prior employees in the position; and (vii) current work experience of employees in similar jobs. 29 C.F.R. § 1630.2(n)(3).

However, Dunderdale could perform the essential functions of the ramp serviceman position *with* a reasonable accommodation. After Dunderdale was injured in 2005, United transferred him to the Matrix position. He successfully held this position for over five years and only lost it due to the change in United's bidding policy, rather than any inability to perform the position's tasks. Thus, Dunderdale was able to perform the essential functions of a ramp serviceman with a reasonable accommodation. *See Mobley v. Allstate Ins. Co.*, 531 F.3d 539, 545 (7th Cir. 2008) (plaintiff could perform essential functions with a reasonable accommodation because she successfully met her performance standards when given an accommodation).

As a result, Dunderdale established he was a qualified individual with a disability. The key issue, then, is whether United failed to reasonably accommodate his disability.

## B. Whether United Failed to Reasonably Accommodate Dunderdale's Disability

Dunderdale argues that United failed to reasonably accommodate his disability because: (1) United did not allow him to remain in the Matrix position; and (2) United did not assign him to one of the no-bid positions for which he believed he was qualified.

### 1. The Matrix Position

Dunderdale claims United accommodated his disability from 2005 through 2011 by placing him in the Matrix position, but ceased accommodating him in May 2011 when he was removed from the position. We hold that United did not have

to maintain Dunderdale in the Matrix position after May 2011 because it would have violated United's seniority system.

In *US Airways, Inc. v. Barnett*, the United States Supreme Court held that it is unreasonable to assign an employee to a position as an accommodation if doing so would violate the employer's seniority system. 535 U.S. 391, 403 (2002). The Court reasoned that, "to require the typical employer to show more than the existence of a seniority system might well undermine the employees' expectations of consistent, uniform treatment–expectations upon which the seniority system's benefits depend." *Id.* at 404. The Court noted, however, that an employee may demonstrate that "special circumstances" exist that justify assigning an individual to a position even if it violates the employer's seniority system. *Id.* at 405.

In this case, both parties agree that United's CBA established a seniority system for bidding on ramp servicemen work areas, and that in May 2011, the Matrix position became subject to the seniority bidding system. Dunderdale lost his position because he did not have sufficient seniority; maintaining Dunderdale in the Matrix position after May 2011 would have violated United's seniority system.

In response, Dunderdale provides two arguments for why these facts should constitute "special circumstances" warranting the exception to the *Barnett* holding.

First, he argues that since United previously restricted the Matrix position for ramp servicemen with permanent work restrictions, it would not be "unduly burdensome" to maintain the status quo. This does not warrant the "special circumstances" exception. In *Barnett*, the Court found that special

circumstances exist when the facts show that the employer does not maintain a consistent and uniform seniority system on which employees rely. *See Barnett*, 535 U.S. at 405. The Court gave two examples illustrating when this may occur: when an employer unilaterally and frequently changes the seniority system such that there is no reasonable expectation among the employees that the system will be followed; or where a seniority system contains significant exceptions such that an additional exception is "unlikely to matter." *Id.* Neither of these apply here.

We initially note that there is no evidence of global disregard for the seniority system at United, nor is there a record that United regularly ignored Union complaints that the Matrix position should be subject to bidding during that time period. Instead, the company was consistent in its policy of using the Matrix position to accommodate certain employees with disabilities during that time. Only when members of the Union began to question their inability to bid for the position did United decide that it should strictly adhere to the terms of the CBA. There is no evidence that this decision was a pretext for disability discrimination. Disabled employees remained able to bid for the Matrix position on the basis of seniority. Neither the decision to accommodate disabled employees in the Matrix position, nor the later decision to strictly adhere to the CBA, affected employee expectations in the manner contemplated by the Supreme Court in *Barnett*.

Prior to May 2011, the Matrix position was not open to United's seniority bidding system for all ramp servicemen. Therefore, the fact that United previously accommodated Dunderdale before May 2011 by restricting the Matrix position

for ramp servicemen with permanent work restrictions does not affect the other ramp servicemen's reliance on the bidding system. Once United opened the Matrix position to the seniority bidding system, all of the ramp servicemen received an expectation of unilateral, consistent treatment regarding bidding for that position. In fact, Dunderdale himself benefitted from that unilateral and consistent treatment because he bid back into the Matrix position once he reclaimed seniority in September 2013. His argument fails.

Second, Dunderdale argues that this case presents "special circumstances" because United changed the bidding system for the Matrix position without anyone first filing a formal grievance. However, employers do not have to maintain positions or job structures that provide reasonable accommodations if the employer finds, for legitimate business reasons, that the position or job structure should be eliminated. *See Gratzl v. Office of the Chief Judges of the 12th, 18th, 19th, and 22nd Judicial Circuits*, 601 F.3d 674, 680 (7th Cir. 2010). Here, United decided to change the structure of the Matrix position's bidding system so that it would conform to the seniority bidding system language of the CBA. Increasing reliability and consistent application of the seniority bidding system is a legitimate business purpose. We will not second-guess United's decision merely because Dunderdale believes United should have waited for a formal grievance filing. *See Ptasznik v. St. Joseph Hospital*, 464 F.3d 691, 697 (7th Cir. 2006) ("Federal courts have authority to correct an adverse employment action only where the employer's decision is unlawful, and not merely when the adverse action is unwise or even unfair.").

### 2. The No-Bid Positions

Dunderdale also argues that he was qualified to perform several no-bid positions despite his work restrictions: Auditor, Bulls-eye, Safety, and the Manpower Office. Further, because they were no-bid positions, Dunderdale argues United could have assigned him to them without violating the seniority bidding system. Since United failed to assign him to any of the positions, Dunderdale claims United failed to provide him with a reasonable accommodation.

The fatal flaw in Dunderdale's argument, as the district court correctly found, is that he failed to establish that any vacancies existed in those positions. Under the ADA, while an employer may have to assign an employee to a different position as a reasonable accommodation, this duty extends "*only to vacant positions*; an employer is not required to 'bump' other employees to create a vacancy so as to be able to reassign the disabled employee." *Gile v. United Airlines, Inc.*, 95 F.3d 492, 499 (7th Cir. 1996) (emphasis added) (citation omitted); *see also Stern v. St. Anthony's Health Center*, 788 F.3d 276, 291 (7th Cir. 2015) ("Although the ADA requires an employer to consider reassigning a disabled employee … the employer's reassignment obligation is nonetheless limited to *vacant* positions.") (emphasis in original) (citation omitted). It is the employee's burden to demonstrate that a vacant position exists. *Jackson v. City of Chicago*, 414 F.3d 806, 813 (7th Cir. 2005) (citations omitted).

Dunderdale argues vacant positions were available because all of the no-bid positions he identified "changed hands" while he was on EIS. Specifically, during the nearly two years that

Dunderdale was on EIS, the Auditor position was filled by two new ramp servicemen, the Bulls-eye position was filled by two new ramp servicemen, the Safety position was filled by two new ramp servicemen, and the Manpower Office position was filled by one new ramp serviceman. Thus, Dunderdale claims this evidence satisfies his burden to demonstrate that a vacant no-bid position existed.

We disagree. This court has previously found that the employee must demonstrate that a vacant position exists at the time of the adverse employment decision. *See McCreary v. Libbey-Owens-Ford Co.*, 132 F.3d 1159, 1165 (7th Cir. 1997) ("[the employee] needed to show that a vacant position in quality control was available at the time [the employer] fired him.") (citation omitted). Under *McCreary*, the no-bid positions had to be vacant on April 21, 2011, when United informed Dunderdale that he had insufficient seniority to retain the Matrix position and would be placed on EIS. At that meeting, Siggal informed Dunderdale that there were no vacancies in any of the identified no-bid positions. In addition, there is also precedent suggesting that the employee has to identify that a vacant position exists at the time the employee requests reassignment to that position. *See Rehling v. City of Chicago*, 207 F.3d 1009, 1014–15 (7th Cir. 2000) (finding the employee failed to produce sufficient evidence that a vacancy in the desired position existed at the time the employee requested reassignment). Here, Dunderdale made two additional requests for assignment to a no-bid position in October 2011 and in April

2013. But, again, he presented no evidence that there were any vacancies available at the time of either request.[2]

Dunderdale relies on *Johns v. Laidlaw Education Services*, 199 F. App'x 568 (7th Cir. 2006), to argue that the fact that the positions changed hands satisfies his burden to show that a vacancy existed. However, there are two problems with Dunderdale's reliance on *Johns*. First, it is an unpublished order issued before January 1, 2007, it is not a precedential decision, and should not have been cited. 7th Cir. R. 32.1. Second, *Johns* is factually distinguishable. The employee in that case, a bus driver on light duty due to an injury, received a letter from her employer stating that she no longer qualified for light duty and instead "will be assigned as a [bus] monitor … until driving routes were available." *Johns*, 199 F. App'x at 569–70 (quotation omitted). On appeal, the employee argued the employer should have assigned her to the bus monitor position. *Id.* at 570. The court found the employee satisfied her burden to show there was a vacancy because the letter stated that since there were no bus routes available, the employer *will* assign the employee to the bus monitor position; inferring that the bus monitor position was available *at that time*. *Id.* at 570–71. By contrast, Dunderdale fails to present any evidence indicating that there was a vacant no-bid position available when he was removed from the Matrix position, or when he made his two

---

[2]   United also claims that Dunderdale was not qualified for any of the no-bid positions at issue because they involved periodic heavy lifting. Since we are deciding this case on the basis of Dunderdale's failure to show that a vacant position existed, we will not address whether he was qualified for the no-bid positions.

requests for reassignment to a no-bid position while he was on EIS.

In addition, it is undisputed that Dunderdale failed to apply for any other position with United while he was on EIS. Other than repeating his request for a no-bid position in October 2011 and April 2013, he made no effort to obtain any other reasonable accommodation, and even refused to participate in the proposed RAP sessions on August 24, 2011, and November 22, 2011. Furthermore, it was Dunderdale's duty to search Skynet for job openings while he was receiving benefits on EIS, and his failure to do so does not establish that United failed to reasonably accommodate his disability. *See Weiler v. Household Finance Corp.*, 101 F.3d 519, 526 (7th Cir. 1996) (employer reasonably accommodated employee by granting her requested time off work, short-term disability benefits, extended leave, and allowed her to use company's "posting" procedure to apply for available positions).

### III. CONCLUSION

For the foregoing reasons, the ruling of the district court is AFFIRMED.

RIPPLE, *Circuit Judge*, dissenting. Because I believe that the summary-judgment record reveals genuine issues of material fact concerning United's failure to reasonably accommodate Mr. Dunderdale's disability and United's responsibility for the breakdown in the interactive process, I respectfully dissent.

## I.

As my colleagues note, Mr. Dunderdale submits that United could have accommodated him by allowing him to remain in a Matrix position—an option they reject based on *US Airways, Inc. v. Barnett*, 535 U.S. 391 (2002). *Barnett* does not require this result.

In *Barnett*, the Court was asked "how the [ADA] resolves a potential conflict between (1) the interests of a disabled worker who seeks assignment to a particular position as a 'reasonable accommodation,' and (2) the interests of the other workers with superior rights to bid for the job under an employer's seniority system." 535 U.S. at 393–94. The Court held that, in the mine run of cases, if a request to transfer disrupts an established seniority system, it is not a "reasonable" accommodation: "The statute does not require proof on a case-by-case basis that a seniority system should prevail. That is because it would not be reasonable in the run of cases that the assignment [of the disabled employee] in question trump the rules of a seniority system. To the contrary, it will ordinarily be unreasonable for the assignment to prevail." *Id.* at 403. The court then offered the following explanation:

> Most important for present purposes, to require the typical employer to show more than the existence of a seniority system might well undermine the employees'

expectations of consistent, uniform treatment—expectations upon which the seniority system's benefits depend. That is because such a rule would substitute a complex case-specific "accommodation" decision made by management for the more uniform, impersonal operation of seniority rules. Such management decisionmaking, with its inevitable discretionary elements, would involve a matter of the greatest importance to employees, namely, layoffs; it would take place outside, as well as inside, the confines of a court case; and it might well take place fairly often. We can find nothing in the statute that suggests Congress intended to undermine seniority systems in this way. And we consequently conclude that the employer's showing of violation of the rules of a seniority system is by itself ordinarily sufficient.

*Id.* at 404–05 (citation omitted).

The Court observed, however, that the plaintiff "remain[ed] free to show that special circumstances warrant[ed] a finding that, despite the presence of a seniority system … the requested 'accommodation' is 'reasonable' on the particular facts." *Id.* at 405. For instance, the Court suggested, a plaintiff might show "that the employer, having retained the right to change the seniority system unilaterally, exercises that right fairly frequently, reducing employee expectations that the system will be followed—to the point where one more departure, needed to accommodate an individual with a disability, will not likely make a difference." *Id.* The plaintiff also "might show that the system already contains exceptions such that, in the circumstances, one further exception is unlikely to matter." *Id.* The Court expressly noted that it did "not

mean these examples to exhaust the kinds of showings that a plaintiff might make." *Id.*; *cf. Tobin v. Liberty Mut. Ins. Co.*, 553 F.3d 121, 127–28 (1st Cir. 2009) (holding that the plaintiff had met his burden of showing that employer's "performance eligibility criteria" for assignment of accounts fell within the "special circumstances" exception of *Barnett* because criteria were not strictly followed and, therefore, deviating from those criteria would not have "frustrated any individual's expectation of receiving" an assignment); *Office of the Architect of the Capitol v. Office of Compliance*, 361 F.3d 633, 642 (Fed. Cir. 2004) (holding that plaintiff had established "sufficient evidence that special circumstances warrant[ed]" a deviation from "AOC's wage grade classification system" where "the evidence show[ed] that AOC ha[d] the authority to make exceptions to the wage grade classification system and that it ha[d] repeatedly exercised that authority").

Here, Mr. Dunderdale has established such special circumstances. From (at least) the time that Mr. Dunderdale returned to work with restrictions in 2005, until United implemented the new bidding process in 2011, United made exceptions to the seniority system for employees with physical restrictions by reserving the Matrix positions for them. The expectation of ramp service employees, therefore, was that there was one area that was not subject to the general seniority bid process. It was United's action in changing that approach that disrupted the employees' expectations.

According to the majority, however, "[o]nce United opened the Matrix position to the seniority bidding system, all of the ramp serviceman received an expectation of unilateral, consistent treatment regarding bidding for that posi-

tion." Slip op. at 11. At bottom, the opinion suggests that, despite an employer's established practice of deviating from a seniority system, it may decide, at any time, to require strict adherence to that system.[1] Moreover, when an employer makes that unilateral decision, an employee may not point to the employer's history of deviations to establish special circumstances for purposes of *Barnett*. I do not believe this approach can be reconciled with *Barnett*. The Court in *Barnett* clearly anticipated that an employer's *past* practice of deviating from a seniority system could establish special circumstances. If an employer were able to negate the impact of its past practices simply by announcing a new policy of strict adherence to a seniority system, the exception created by *Barnett* would be illusory.

My colleagues also rely on our decision in *Gratzl v. Office of the Chief Judges of the 12th, 18th, 19th, and 22nd Judicial Circuits*, 601 F.3d 674, 680 (7th Cir. 2010), for the proposition that

---

[1] The majority states that United made the decision to adhere strictly to the seniority system "[o]nly when members of the Union began to question their inability to bid for the [Matrix] position[s]." Slip op. at 10. The record reveals, however, that Debra DiSantis, former Manager of Performance and Labor for United's O'Hare operation, received questions from employees *with physical restrictions* about how they could bid into the Matrix area; she testified that "[t]he union would ask questions, employees would come in and say, 'I wanna work in there because I can't do this or that,' so lots of people came to see me about things, and that was a topic I got questions about." R.52-3 at 13 (DiSantis Dep. 48). Her actions were not in response to any specific grievances; indeed, she could not remember any grievances being filed with respect to the prior bidding process for the Matrix. Moreover, she was "not being pressured by anybody" to change the bidding process. *Id.* at 16 (DiSantis Dep. 59). She simply "found a process that was not following the guidelines as it should and was not working well and I looked for a way to fix that." *Id.* (DiSantis Dep. 60).

"employers do not have to maintain positions or job struc-
tures that provide reasonable accommodations if the em-
ployer finds, for legitimate business reasons, that the position
or job structure should be eliminated." Slip op. at 11. *Gratzl*,
however, has little bearing on the case before us.

In *Gratzl*, a court reporter, who suffered from inconti-
nence, had been employed as a "Court Reporting Specialist,"
a position that did not require her to perform courtroom re-
porting duties. A few years later, "[t]he State of Illinois elimi-
nated the 'Court Reporting Specialist' job title and consoli-
dated all reporters under the title 'Official Court Reporter,'"
*id.* at 677, a position that required courtroom reporting duties.
Gratzl refused numerous accommodations offered by the
court and, instead, brought an ADA action in which she
claimed that her employer had failed to reasonably accommo-
date her when it refused to assign her only to non-courtroom
duties. In evaluating her claim, we first determined that
Gratzl was not a qualified individual with a disability. In do-
ing so, we rejected Gratzl's argument that, because she could
perform the functions of a "Court Reporting Specialist," she
also could perform the duties of an "Official Court Reporter":

> Gratzl cannot prove that she is qualified for her current
> job simply by citing evidence that she was qualified for
> a previous job, with different essential functions, that
> has been eliminated. Gratzl is unable to sit in the court-
> room during proceedings without disrupting court;
> she has offered no evidence to the contrary and, in fact,
> her refusal to consider any accommodation that re-
> quired that she do in-court reporting strongly suggests
> that she believed she was incapable of performing this
> function. Therefore, she is not qualified for the job.

*Id.* at 680. Looking at the question another way, we held that Gratzl's requested accommodation—"exclusive assignment to the control room"—was not reasonable because "[a]n employer need not create a new job or strip a current job of its principal duties to accommodate a disabled employee." *Id.* (citing *Ammons v. Aramark Uniform Servs., Inc.*, 368 F.3d 809, 819 (7th Cir. 2004)).

Putting aside the myriad of other factual distinctions between *Gratzl* and the present case, Mr. Dunderdale is not requesting that United create a new job or strip a current job of its principal duties; the Matrix position continues to exist, and Mr. Dunderdale is not requesting *any* change in its duties. Instead, the accommodation that he seeks is to be allowed to *bid* for that existing position on the same terms as he did prior to 2011.

## II.

I also would hold that Mr. Dunderdale has raised a genuine issue of material fact with respect to the breakdown in the interactive process. The majority opinion faults Mr. Dunderdale for simply "repeating his request for a no-bid position," for failing to respond to two invitations to participate in "RAP" sessions in August and November of 2011, and for failing to "search Skynet for job openings while he was receiving benefits on EIS." Slip op. at 15. As we have noted, however, "[t]he last act in the interactive process is not always the cause of a breakdown, … and the courts must examine the process as a whole to determine whether the evidence requires a finding that one party's bad faith caused the breakdown." *EEOC v. Sears, Roebuck & Co.*, 417 F.3d 789, 806 (7th Cir. 2005). Under the circumstances presented here, I believe a jury reasonably

could conclude that United, not Mr. Dunderdale, was responsible for the breakdown in the interactive process.

Mr. Dunderdale was informed in April 2011 that, because of his lack of seniority, he had not won the bid to work in the Matrix. Thereafter, he met with a United representative and expressed his interest in transferring to another position, specifically one of the "no-bid" positions. Mr. Dunderdale was informed, however, that "the only place [he] was able to work was the Matrix." R.52-1 (Dunderdale affidavit) at 3.

Following this meeting, United invited Mr. Dunderdale to participate in two "RAP" sessions, one in August 2011 and one in November 2011. Mr. Dunderdale, however, previously had participated in "RAP" sessions. Mr. Dunderdale states—and United does not contest—that the RAP sessions consisted of Mr. Dunderdale's receiving "technical instruction on how to perform searches" on United's Skynet. *Id.* at 4. As Mr. Dunderdale already had received this instruction, he did not respond to the invitations in August and November.

An employer must take "an active, good-faith role in the interactive process." *Sears, Roebuck & Co.*, 417 F.3d at 806. To invoke the interactive process, an employee simply needs to say "'I want to keep working for you—do you have any suggestions?'" *Miller v. Ill. Dep't of Corr.*, 107 F.3d 483, 487 (7th Cir. 1997). At that point, "the employer has a duty under the Act to ascertain whether he has some job that the employee might be able to fill." *Id.* Specifically,

> [f]irst, an employer is required to "identify the full
> range of alternative positions for which the individual
> satisfies the employer's legitimate, nondiscriminatory
> prerequisites." Next, he must "determine whether the

> employee's own knowledge, skills, and abilities would enable her to perform the essential functions of any of those alternative positions, with or without reasonable accommodations." We underscored that an "employer's duty to accommodate requires it to consider transferring the employee to any of these other jobs, including those that would represent a demotion."

*Hendricks-Robinson v. Excel Corp.*, 154 F.3d 685, 694–95 (7th Cir. 1998) (quoting *Daltan v. Subaru-Isuzu Auto., Inc.*, 141 F.3d 667, 678 (7th Cir. 1998)).

United's efforts on Mr. Dunderdale's behalf fell far short of these marks. There simply is nothing in the record to support a conclusion that United undertook a comprehensive search for available, alternative positions. United's response to Mr. Dunderdale was a perfunctory "no" to his request for a transfer.[2]

My colleagues point to our decision in *Weiler v. Household Finance Corp.*, 101 F.3d 519 (7th Cir. 1996), to support their contrary conclusion—that "it was Dunderdale's duty to search Skynet for job openings while he was receiving benefits on EIS." Slip op. at 15. I do not believe *Weiler* supports such a broad proposition.

---

[2] Although United does not make this argument, it is possible that it *did* undertake the comprehensive analysis anticipated by *Hendricks-Robinson v. Excel Corp.*, 154 F.3d 685, 694–95 (7th Cir. 1998), but concluded that there were no other positions available for which Mr. Dunderdale was qualified. If that is the case, however, then it also cannot fault Mr. Dunderdale for failing to conduct a search for available positions on its Skynet because such a search would have been futile.

In *Weiler*, the plaintiff suffered from physical symptoms as well as depression and anxiety, which she attributed to working for a specific supervisor. We held that the plaintiff had not established that she was "disabled" for purposes of the ADA because "[t]he major life activity of working is not 'substantially limited' if a plaintiff merely cannot work under a certain supervisor because of anxiety and stress related to his review of her job performance." *Id.* at 524. Even assuming, however, that she were disabled, we concluded that her employer had reasonably accommodated her condition. We noted that, in addition to granting her short-term disability, applying for long-term disability benefits on her behalf, and "allow[ing] her to post for a new position in the company in the same salary grade," her employer's personnel manager also "searched for a similar position for her in the company under a different supervisor, but none was available. … [It] even contacted her and offered her alternative available positions within her salary grade and invited her to interview for them." *Id.* at 526.

In contrast to the efforts of Weiler's employer, however, there is no evidence in this record that United management attempted to locate positions for which Mr. Dunderdale was qualified or to facilitate his placement in those positions. On the record before us, a jury reasonably could conclude that United made no effort to transfer Mr. Dunderdale, but simply pointed him to a website and required him to do the rest. Under our case law—including *Weiler*—this is not a sufficient response.

We have noted that "[n]o hard and fast rule will suffice" for attributing blame for the breakdown of the interactive process. *Beck v. Univ. of Wis. Bd. of Regents*, 75 F.3d 1130, 1135 (7th Cir. 1996). "Rather, courts should look for signs of failure to

participate in good faith … . A party that fails to communi-
cate, by way of initiation or response, may also be acting in
bad faith." *Id.* Here, there is evidence from which a jury rea-
sonably could conclude that United's lack of response to Mr.
Dunderdale's request to be transferred caused the breakdown
in the interactive process.

For these reasons, I respectfully dissent.